UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JTH TAX, INC., d/b/a LIBERTY TAX                              Plaintiffs
SERVICE, ET AL.

v.                                          Civil Action No. 3:19-cv-00085-RGJ

FREEDOM TAX, INC., ET AL.                                     Defendants

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiffs JTH Tax, Inc., d/b/a Liberty Tax Service ("JTH"), and Siempretax+, L.L.C. ("Siempre Tax") (collectively, "Liberty") bring this action against Defendants Freedom Tax, Inc. ("Freedom") and Adisa Selimovic seeking relief for alleged violations of the Lanham Act, 15 U.S.C. §§ 1114, 1125, *et seq.*, and the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* [DE 1; DE 33].[1] The Court issued a temporary restraining order (the "TRO"). [DE 18]. Liberty now moves for a preliminary injunction. [DE 13]. Briefing is complete, and the motion is ripe. [*See* DE 22; DE 26; DE 29; DE 31]. For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** Liberty's Motion.

### FINDINGS OF FACT

Liberty is a franchisor of Liberty Tax Service® tax-preparation services throughout the United States. [DE 33 at ¶ 19].[2] Liberty owns various Liberty Tax Service® trademarks, service

---

[1] Liberty filed an Amended Complaint for Injunctive Relief and Damages. [DE 33]. Liberty later filed a Consent Motion for Leave to File Amended Complaint Out of Time and to Extend Deadline for Defendants' Responsive Pleading, which the Court granted. [DE 37; DE 39].

[2] JTH is a Delaware corporation with its principal place of business in Virginia Beach, Virginia. [DE 33 at ¶ 7]. Siempre Tax is a Virginia limited liability company with its principal place of business in Virginia Beach. [*Id.* at ¶ 8]. Liberty Tax, Inc. is a Delaware corporation with its principal place of business in Virginia Beach and is the sole member of Simpre Tax. [*Id.*].

marks, logos, and derivations thereof ("the Marks") registered with the United States Patent and Trademark Office ("USPTO"). [*Id.* at ¶ 20]. Liberty is also a franchisor of the Liberty Tax Service® tax-preparation system, which sells income tax–preparation and filing services and products to the public under the Marks. [*Id.* at ¶ 20]. With the name "Liberty Tax" and its derivations, the Marks include a logo of Lady Liberty with the words "Liberty Tax" [DE 13-18], a Lady Liberty costume [DE 13-19], and the phrase "Cash in a Flash" [DE 13-16], all used to advertise tax-preparation services.[3] Liberty grants licenses to franchisees to use the Marks and participate in its confidential and proprietary business system through written franchise agreements. [DE 33 at ¶ 23].

Freedom is a tax-preparation service with eight total locations in Kentucky, Indiana, and California. [DE 31 at 715]. Selimovic incorporated Freedom in 2017 and is president of the company.[4] [*Id.*]. Selimovic was also an officer of The Franchise Corp., a now-defunct tax-preparation business incorporated, owned, and operated by Marcus Warren. [DE 26, Tr. PI Hearing at 562:1–4]. The Franchise Corp. and Warren, both non-parties, were signatories to franchise agreements with Liberty (the "Franchise Agreements"). [*See* DE 33-1]. Neither Freedom nor Selimovic was a signatory to the Franchise Agreements or any other agreements with Liberty. [*Id.*; DE 22-1 at ¶ 3]. Selimovic was Secretary and General Manager of The Franchise Corp. from 2014–2015 and 2016–2018, respectively. [DE 13-4–13-8].

---

[3] USPTO Serial Numbers 76066158, 75462809, 76066157, 77365636, and 76617154. Freedom states that it has removed all references to "Cash in a Flash" from Freedom's advertising sources and ceased using Lady Liberty costumes pending a final decision on the merits of this case. [DE 31 at ¶¶ 49–50]. Freedom also states that it has also removed all Lady Liberty signage inside and outside its locations and from its Facebook pages. [*Id.* at ¶¶ 33–34].

[4] Freedom is a Kentucky corporation with its principal place of business in Louisville, Kentucky. [DE 33 at ¶ 9]. Selimovic is a citizen of Kentucky and resident of Louisville. [*Id.* at ¶ 10].

Under the Franchise Agreements, Warren owned several now-defunct Liberty Tax Service® franchises in Kentucky, Indiana, and California (the "Franchise Locations"). [DE 33 at ¶ 27]. As part of the Franchise Agreements, Liberty provided Warren and The Franchise Corp., among other things, training in franchise operations, marketing, advertising, sales, and business systems, as well as confidential operating, marketing, and advertising materials that are unavailable to the public. [*Id.* at ¶ 32].

Under Paragraph 10(e) of the Franchise Agreements, Warren and The Franchise Corp. agreed "that during the term of this Agreement, [they] w[ould] not lease, sub-lease, assign or guaranty a lease in the Territory to or for a person or entity who will offer income tax preparation at such an office." [DE 32-1 at 816]. Paragraph 15(a) of the Franchise Agreements stipulated that Liberty was entitled to a right of first refusal of any "signed, bona fide offer to purchase or otherwise transfer the Franchise or any interest in the Franchise." [*Id.* at 819]. And under Paragraph 10(b) of the Franchise Agreements, Warren and The Franchise Corp. agreed to a post-termination covenant not to compete "[f]or a period of two (2) years following the termination, expiration, transfer or other disposition of the Franchised Business . . . and agree[d] not to directly or indirectly, for a fee or charge, prepare or electronically file income tax returns . . . within the Territory or within twenty-five miles of the boundaries of the Territory." [*Id.* at 815].

On January 12, 2018, Liberty sent Notices to Cure Default to Warren and The Franchise Corp. notifying them of various alleged breaches of the Franchise Agreements. These breaches included improper usage of third-party tax software and failure to pay hundreds of thousands of dollars owed to Liberty, past due at the time of termination. [DE 33 at ¶ 35]. But on January 13, 2018, Selimovic purchased substantially all of The Franchise Corp.'s assets from Warren, including the leaseholds for the formerly-Liberty, now-Freedom, locations at issue. [DE 22-1 at ¶

6].[5]  After providing an opportunity to cure, Liberty terminated the Franchise Agreements on January 23, 2018.  [DE 33 at ¶ 36].  At that time, Liberty also requested that Warren transfer assets and assign the leases for the Franchise Locations to Liberty.  [*Id.* at ¶ 37].

On January 30, 2018, Liberty filed suit in the United District Court for the Eastern District of Virginia against Warren and The Franchise Corp., alleging breach of the Franchise Agreements and trademark infringement.  *See JTH Tax, Inc. d/b/a Liberty Tax Service and SiempreTax+, L.L.C. v. Marcus Warren and The Franchise Corp.*, Case No. 2:18-cv-54.  Warren and The Franchise Corp. stipulated to the terms of a preliminary injunction (the "Injunction"), which the Eastern District of Virginia entered on July 2, 2018.  [DE 1-3 at 50].  The Injunction, which remains in effect, enjoins Warren and The Franchise Corp. from, among other things, "using and/or displaying the Marks without Liberty's consent; . . . using the Marks or any confusingly similar name, which is likely to cause confusion or mistake or deceive the public; . . . [and] from diverting or attempting to divert any customer or business from Liberty or solicit[ing] or endeavor[ing] to obtain the business of any customer or prospective customer of any of the Franchise Locations."  [*Id.* at 51–52].

By at least March 12, 2018, Liberty was aware that Selimovic had purchased substantially all of The Franchise Corp.'s assets, including the leaseholds.  [DE 26, Tr. PI Hearing at 529:8–11; DE 31 at 721].  At the same time, Liberty possessed images of Freedom's signage—including the name "Freedom Tax" and a logo featuring Lady Liberty—at The Franchise Corp.'s previous locations.  [*Id.* at at 538:13–17].  Liberty did not dispute the use of the Marks at that time because "tax season [was] about over and [it] had other priorities."  [*Id.* at 538:23–25].

---

[5] Before selling the assets to Selimovic, Warren did not give the right of first refusal to Liberty, as required by the Franchise Agreements, and did not notify Liberty of the sale to Selimovic.  [DE 26, Tr. PI Hearing at 529:12–14].

During the 2019 income tax season, Selimovic continued to operate Freedom at the former Franchise Locations in and around Louisville.[6]  Photographs taken in January 2019 show depictions of Lady Liberty on signage inside and outside the stores, as well as on promotional material, and signs both inside and outside the stores that read "$50 Ca$h in a Flash." [DE 13-22 at 180–216].  At least one location featured an individual dressed as Lady Liberty outside the store holding a sign with the Freedom Tax insignia.  [DE 13-22 at 183, 206–09].  Freedom Tax also maintained at least two Facebook pages, one for Louisville and one for Shelbyville.  [DE 13-12 at 138–57; DE 13-13 at 158–60].  The Facebook pages included graphic depictions of Lady Liberty, "CA$H IN A FLASH" graphics, photographs of individuals holding the "CA$H IN A FLASH" sign, and photographs of individuals wearing Lady Liberty costumes and headpieces.  [DE 29 at 603].  Freedom's website—www.freedomtaxusa.net—is registered in Warren's name.  [DE 31 at 726].  Selimovic asserts that she used Warren's GoDaddy account to purchase Freedom's domain, but that Warren is not involved with Freedom or its operations.  [*Id.*].

Rosie Trimmer is a receptionist at three Liberty Tax Service® franchised locations in Louisville, working mainly at 3317 Taylor Boulevard.  [DE 26, Tr. PI Hearing at 546:11–13].  Trimmer testified that of the approximately 200 calls she answered this tax season, "99 percent of [the] phone calls [we]re thinking that that they did their taxes at Liberty" when they had their taxes done at Freedom.  [*Id.* at 548:7–10].  Trimmer testified that when she receives those calls, "[she] ask[ed] them the location" and whether it ""[w]as [] down there at the strip mall where the Dollar General is?' And if they sa[id] yes, [she said], 'I'm sorry.  That's Freedom Tax.'"  [*Id.* at 548:15–18].  Trimmer testified that she did not memorialize these calls in writing.  [*Id.* at 550:16–18].

---

[6] The locations include 3428 Taylor Boulevard, Louisville, KY 40215; 5917 New Cut Road, Louisville, KY 40214; 2113 W. Broadway, Louisville, KY 40211; 801 W. Broadway, Louisville, KY 40202; 5005 Preston Highway, Louisville, KY 40213; 1641 Midland Trail, Shelbyville, KY 40065; 2805 N. Hurstbourne Parkway, Louisville, KY 40223; and 1305 Veterans Parkway, Clarksville, IN 47129.

On February 1, 2019, Liberty sued Freedom and Selimovic in this Court, seeking injunctive relief for alleged violations the Franchise Agreements' covenant not to compete and infringement of the Marks. [DE 1; DE 33]. On March 12, 2019, Liberty moved for the TRO and a preliminary injunction to enjoin Freedom and Selimovic from competing with Liberty and from infringing the Marks. [DE 13]. The Court entered the TRO and enjoined Freedom and Selimovic from using or displaying the Marks and from using any confidential information from manuals or systems provided by Liberty to its franchisees. [DE 18 at 240–41]. The Court held a preliminary injunction hearing on March 21, 2019. [DE 25]. The parties filed post-hearing proposed findings of fact and conclusions of law. [DE 29; DE 31]. The Court then extended the TRO for good cause. [DE 32].

## CONCLUSIONS OF LAW

A preliminary injunction is an extraordinary measure that is "one of the most drastic tools in the arsenal of judicial remedies." *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (citation and internal quotation marks omitted). Courts should thus apply this remedy "only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (citation and internal quotation marks omitted).

When considering a motion for a preliminary injunction, a district court must balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would substantially harm others; and (4) whether issuance of the injunction would serve the public interest. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citing *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). A district court need not make specific findings on each factor if fewer factors resolve the issue. *Id.* But "it is generally useful for the district court to analyze all four of the preliminary injunction

factors" because the Sixth Circuit's analysis of one of the factors may differ. *Leary*, 228 F.3d at 739 n.3. Although a court must balance the relevant preliminary injunction factors, "a finding that there is no likelihood of irreparable harm . . . or no likelihood of success on the merits . . . is usually fatal." *CLT Logistics v. River W. Brands*, 777 F. Supp. 2d 1052, 1064 (E.D. Mich. 2011) (citing *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008); *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)). "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (citing *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 441 (1974)).

**A.    Likelihood of Success on the Merits**

In its Complaint, Liberty outlines seven separate claims against Freedom and Selimovic: trademark infringement (Count I), false designation and misrepresentation (Count II), trademark dilution (Count III), violation of the Defend Trade Secrets Act (Count IV), tortious interference with contract (Count V), unjust enrichment (Count VI), and unfair competition (Count VII).  [DE 33 at ¶¶ 60–103].  Liberty's Motion for Preliminary Injunction and Proposed Findings of Fact and Conclusions of Law do not address Liberty's claims for tortious interference with contract (Count V) or unjust enrichment (Count VI).  [DE 13-1; DE 29].  Instead, Liberty's filings focus exclusively on the intellectual property claims.

**1.  Infringement**

To show that an infringement claim under the Lanham Act is likely to succeed on the merits, a plaintiff must establish (1) its ownership and continuous use of its specific mark in connection with specific services, (2) that the defendant used the mark in commerce, and (3) a

likelihood of confusion among consumers resulting from the defendant's use of the mark. *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing 15 U.S.C. §§ 1127, 1114(1)).[7]

There is no dispute that Liberty owns the federally-registered Marks at issue or that Liberty uses the Marks in commerce. [*See* DE 13-14–13-19; DE 31 at 736]. Accordingly, Liberty must only establish that confusion is likely. *Hensley Mfg.*, 579 F.3d at 609.

"The touchstone of liability [for infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997). To determine whether confusion is likely, a court will typically weigh eight factors: (1) strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of the defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Id.*; *see also Hensley Mfg.*, 579 F.3d at 610. Courts assess each factor for the relevant consumer market, and potential buyers of the "junior" product are the relevant consumers. *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012) (citing *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 518 (6th Cir. 2007)).

### i. Strength of the Senior Mark

"The strength of a mark is a determination of the mark's distinctiveness and degree of recognition in the marketplace." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d

---

[7] Liberty also alleges common law infringement, which likewise requires it to show that its mark is legally protectable, and that Defendants' infringement is likely to cause confusion. *Colston Inv. Co. v. Home Supply Co.*, 74 S.W.3d 759, 767 (Ky. Ct. App. 2001); *see also Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 856 (6th Cir. 2018) ("Because Kentucky common law tracks federal law in this area, we apply a uniform framework.").

1100, 1107 (6th Cir. 1991). This evaluation encompasses two components: (1) the mark's place on the spectrum of distinctiveness, and (2) "the marketplace recognition value of the mark." *Maker's Mark*, 679 F.3d at 419 (citation omitted). A "mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both." *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985) (quoting A R. Callmann, UNFAIR COMPETITION, TRADEMARKS & MONOPOLIES, § 20.43, at 345 (4th ed. 1983)). The stronger the mark, the greater the likelihood of confusion. *Homeowners Grp., Inc.*, 931 F.2d at 1107.

As for the first component, "once a mark has been registered for five years, the mark must be considered strong and worthy of full protection." *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 600 (6th Cir. 1991) (citation omitted). The Marks here have been on the USPTO's principal register for more than five years. [*See* DE 13-16; DE 13-18; DE 13-19]. The Marks are therefore strong. *Wynn Oil Co.*, 943 F.2d at 600.

As to the second component, the Court measures a mark's commercial strength by whether it has been subject to "wide and intensive advertisement[.]" Homeowners *Grp., Inc.*, 931 F.2d at 1107 (citing *Frisch's Rest., Inc.*, 759 F.2d at 1264). However, "[t]he use of the mark [by third parties] throughout the state, country, and on the internet weakens the strength of the mark." *Citizens Banking Corp. v. Citizens Fin. Grp., Inc.*, 320 F. App'x 341, 346–47 (6th Cir. 2009) (internal citations omitted) (finding that Citizens Bank's mark was commercially weak because "three hundred banks nationwide use a Citizens mark, including five other banks and a credit union in Michigan," and "the record made clear that many of those marks are in use—particularly in Michigan"); *see also CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 269–270 (4th

Cir. 2006) (concluding "extensive third-party use also demonstrates that CareFirst's mark lacks commercial strength in many parts of the country"). "Indeed, courts have found extensive third-party uses of a trademark to substantially weaken the strength of a mark." *Homeowners Grp., Inc.*, 931 F.2d at 1108 (collecting cases).

The terms and images comprising Liberty's Marks—"Liberty," "Tax," and Lady Liberty—are widely used in the tax and financial services industries throughout the country. [*See* DE 22-2; DE 31 at 728–29]. Several entities in Kentucky use the name "Liberty," including organizations involved in accounting, payroll, banking, financial services, benefits administration, and billing. [DE 22-2 at ¶ 5]. But unlike in *Citizens Banking*, there is no evidence of other tax-preparation services in Kentucky using Liberty's Marks. While in *Citizens Banking* there were over 300 banks nationwide using the "Citizens" mark, the use of the Marks in the tax-preparation business is not so widespread. Given this and that Liberty "advertises and promotes the Marks throughout the United States," [DE 33 at ¶ 22], this factor either favors Liberty or is neutral.

### ii. Relatedness of the Goods or Services

Courts employ three criteria to test the relatedness of goods or services. "First, if the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; finally, if the products are unrelated, confusion is unlikely." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 797 (6th Cir. 2004) (citing *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003)). "The relatedness inquiry therefore focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or

sponsored by a common company." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 633 (6th Cir. 2002) (citation and internal quotation marks omitted).

Liberty and Freedom are both in the tax-preparation business and thus direct competitors. [*See* DE 33 at ¶¶ 19, 43]. And as noted below, the marks are similar. This factor favors Liberty.

### iii. Similarity of the Marks

"Similarity of marks is a factor of considerable weight." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 283. In assessing similarity, a court should consider the "pronunciation, appearance, and verbal translation of conflicting marks." *Id.*; *see also AutoZone, Inc.*, 373 F.3d at 795. A side-by-side comparison of the marks is not appropriate, although the commonalities of the respective marks must be the point of emphasis. *AutoZone, Inc.*, 373 F.3d at 795. And "courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark." *Id.* (citing *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 283). As a result, courts must view the "marks in their entirety and focus on their overall impressions, not individual features." *Id.* (citations omitted).

Here, the relevant marks are "Liberty Tax" and "Freedom Tax" and their respective logos. The marks share several commonalities. First, each prominently features the head of Lady Liberty. Second, each mark is composed of red, white, and blue colors. Third, both "Liberty Tax" and "Freedom Tax" are styled in all capital letters. And the words "liberty" and "freedom," while not linguistically similar, share the same connotation. "Liberty" and "freedom" share the definition of "The state of not being imprisoned or enslaved." *Compare Freedom*, Oxford English Dictionary *with Liberty*, Oxford English Dictionary. In fact, the terms are synonyms. *See*

*id.* Because the relevant inquiry is "whether a given mark would confuse the public when viewed alone" to account for "consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark," the marks' commonalities make it likely that their overall impression would lead an average consumer to assume they are related. The marks are thus sufficiently similar that this factor favors Liberty.

Freedom uses the relevant marks—"Cash in a Flash" for advertising tax-preparation services [DE 13-16] and Lady Liberty costumes for advertising tax-preparation services [DE 13-19]— in identical ways to Liberty to advertise the companies' respective tax-preparation services. [*See* DE 13-12, Ex. L]. In both cases, the companies use the phrase "Cash in a Flash"—or, in Freedom's case, "CA\$H IN A FLASH"—on advertising materials and use Lady Liberty costumes to advertise their services. These marks are thus sufficiently similar that this factor favors Liberty.

### iv.  *Evidence of Actual Confusion*

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988). "[A] lack of such evidence is rarely significant, and the factor of actual confusion is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 284 (citations and internal quotation marks omitted). But where evidence of actual confusion exists, the weight courts should give to this evidence varies depending on both the type and amount of confusion. *Homeowners Grp., Inc.*, 931 F.2d at 1110. The Sixth Circuit has explained that "the existence of only a handful of instances of actual confusion after a significant time or a significant degree of concurrent sales under the respective marks may even lead to an inference than no likelihood of confusion exists." *Id.* Similarly, "confusion that is brief or that occurs among individuals who are not

familiar with the products in question is entitled to considerably less weight" than "chronic mistakes and serious confusion of actual customers." *Therma-Scan, Inc.*, 295 F.3d at 634.

Rosie Trimmer, a receptionist at three Liberty Tax Service® Franchised Locations in Louisville, testified that of the approximately 200 calls she answered this tax season, "99 percent of [the] phone calls [we]re thinking that that they did their taxes at Liberty" when they had their taxes done at Freedom. [DE 26, Tr. PI Hearing at 548:7–10]. Trimmer testified that when she receives those calls, "[she] ask[ed] them the location" and whether it "'[w]as [] down there at the strip mall where the Dollar General is?' And if they sa[id] yes, [she said], 'I'm sorry. That's Freedom Tax.'" [*Id.* at 548:15–18]. Trimmer testified that she did not memorialize these calls in writing. [*Id.* at 550:16–18].

Defendants try to discount Trimmer's testimony by asserting that Trimmer was a "non-credible witness" because "[i]t is not believable that Ms. Trimmer received only two (2) calls from Liberty customers during the peak of tax season, from January through the day of Ms. Trimmer's testimony on March 21, 2019, regarding non-[Freedom] related matters." [DE 31 at 730–31]. While it is possible that Trimmer exaggerated the number of misdirected calls she answered, the Court finds no reason to discount Trimmer's sworn testimony that there are instances of actual confusion. This factor thus favors Liberty, but the Court affords it minimal weight given the lack of supporting evidence and other evidence of actual confusion.

### v. Marketing Channels Used

Courts consider the respective marketing channels of the parties to an infringement action to determine "how and to whom the respective goods or services of the parties are sold." *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 357 (6th Cir. 2006) (citation and internal quotation marks omitted). "[I]f the services of one party are sold through different

marketing media in a different marketing context than those of another seller, the likelihood that either group of buyers will be confused by similar service marks is much lower than if both parties sell their services through the same channels of trade." *Homeowners Grp., Inc.*, 931 F.2d at 1110. Put differently, "[t]here is less likelihood of confusion where the goods are sold through different avenues." *Leelanau Wine Cellars, Ltd.*, 502 F.3d at 519. This factor becomes particularly important where the other factors are not helpful because it "is very significant in illuminating what actually happens in the marketplace." *Therma-Scan, Inc.*, 295 F.3d at 636–37 (citing *Homeowners Grp., Inc.*, 931 F.2d at 1110).

Freedom operates and promotes its tax-preparation business at former Liberty franchise locations. [DE 13-1 at 107]. Like Liberty, Freedom advertises its services through an individual dressed as Lady Liberty and online, including on Facebook. [*Id.* at 100–01]. Because both parties market their services online, this factor favors Liberty. *See Victoria's Secret Stores v. Artco Equip. Co.*, 194 F. Supp. 2d 704, 727 (S.D. Ohio 2002) (finding that both parties marketing their products online was "a sufficient similarity between marketing channels to find likelihood of confusion"); *see also PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 253–53 (6th Cir. 2003), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004) (affirming the district court's finding that the parties advertised through the same marketing channels because both parties marketed their goods and services online despite the district court not being presented any "proof regarding Internet marketing's effect on consumer confusion").

### vi. Likely Degree of Purchaser Care

In assessing the likelihood of confusion to the public, courts consider "the typical buyer exercising ordinary caution." *Homeowners Grp., Inc.*, 931 F.2d at 1111. But "when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a

higher standard is proper." *Id.* Similarly, when services are expensive or unusual, courts expect that the buyer will exercise greater care in his purchases. *Id.* For example, a consumer would be less careful in making a purchasing choice for an inexpensive item than if the item were expensive. *See AutoZone, Inc.*, 543 F.3d at 933. On the other hand, "[t]he services offered by . . . banks subject prospective customers to invasive and prolonged inquiries before the services are rendered. Customers do not carelessly sign themselves up for such investigative procedures, indicating that banking customers exercise an elevated degree of care." *Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F. Supp. 2d 811, 831 (C.D. Ill. 2009).

Tax-preparation services are relatively inexpensive and widely available. That said, like banks, tax-preparation services are unusual and require inquiries into one's financial and personal life. Freedom "customers supply [Freedom] with extensive personal and protected information including, but not limited to, bank account numbers, social security numbers, wage and earnings reports, marital information, child support and alimony records, judgment and garnishment records." [DE 31 at 746]. This factor thus favors Freedom.

*vii. Intent of the Defendant in Selecting the Mark*

The intent of the defendant in a service mark action is relevant because "purposeful copying indicates that the alleged infringer . . . believes that his copying may divert some business from the senior user." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 286. Because of this, "[i]ntent is an issue whose resolution may benefit only the cause of the senior user, not of an alleged infringer." *Leelanau Wine Cellars, Ltd.*, 502 F.3d at 520 (citation and internal quotation marks omitted). Proving intent is unnecessary to show likelihood of confusion, but "the presence of that factor strengthens the likelihood of confusion." *Wynn Oil Co.*, 943 F.2d 595, 602 (6th Cir. 1991); *see also Wynn Oil Co.*, 839 F.2d at 1189. If a party chooses a mark intending to cause

confusion, "that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners Grp., Inc.*, 931 F.2d at 1111. "Circumstantial evidence of copying, particularly the use of a contested mark with knowledge of the protected mark at issue, is sufficient to support an inference of intentional infringement where direct evidence is not available." *Therma-Scan, Inc.*, 295 F.3d at 638–39 (citation and internal quotation marks omitted).

Here, there is no direct evidence of Defendants' intent in selecting the Freedom marks. But there is ample circumstantial evidence that Selimovic, and by extension Freedom, knew about the protected Marks at issue. Selimovic was an officer of The Franchise Corp., which signed the Franchise Agreements with Liberty. [DE 26, Tr. PI Hearing at 562:1–4]. And The Franchise Corp., of which Selimovic was still an officer, agreed to the Injunction in the Eastern District of Virginia. [DE 1-3 at 50]. This factor thus favors Liberty.

*viii.   Likelihood of Product-Line Expansion*

"[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 287 (quoting *Homeowners Grp., Inc.*, 931 F.2d at 1112). "A finding that the parties will not expand their markets significantly, however, 'does not address' the ultimate issue of likelihood of confusion." *Id.* (quoting *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1122 (6th Cir. 1996)). "Thus, as with the seventh factor, an affirmative finding will provide a strong indication that the parties' simultaneous use of the marks is likely to lead to confusion, while a negative finding is not a strong indication to the contrary." *Id.* (citing *Champions Golf Club, Inc.*, 78 F.3d at 1122).

When the two parties' products directly compete with each other, "the likelihood [of expansion of product lines] is already a reality." *Wynn Oil Co.*, 943 F.2d at 604 (citation and

internal quotation marks omitted). Liberty and Freedom are both in the tax-preparation business and direct competitors. [*See* DE 33 at ¶¶ 19, 43]. This factor thus favors Liberty.

### ix. Balancing of Factors

"[I]n the course of applying the[se] factors, '[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.'" *Progressive Distrib. Servs. v. UPS, Inc.*, 856 F.3d 416, 436 (6th Cir. 2017) (quoting *Homeowners Grp., Inc.*, 931 F.2d at 1107). Of the eight factors, only one favors Defendants. Particularly given the similarity of the marks, the weight of these factors suggest that Defendants' use of Liberty's Marks is likely to cause confusion. For these reasons, Liberty's infringement claim is likely to succeed on the merits.

### 2. False Designation and Misrepresentation of Origin

"The Lanham Act covers trademark infringement as well as a host of other deceptive practices that might loosely be termed 'unfair competition.' One such form of unfair competition is the false designation of origin." *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998). Put differently, "false designation is simply a species of unfair competition," meaning that "the two claims are one in the same." *Gen. Motors. Corp.*, 453 F.3d 351, 354 (6th Cir. 2006) (quoting *Champions Golf Club, Inc.*, 78 F.3d at 1123). The test for false designation or misrepresentation under the Lanham Act is essentially the same as that for infringement. *Serv. Merch. Co. v. Serv. Traveling Stores, Inc.*, 737 F. Supp. 983, 999 (S.D. Tex. 1990). The Lanham Act imposes civil liability on

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person. . . .

15 U.S.C. § 1125(a)(1)(A). "A Lanham Act claim for false designation of origin must contain two elements: (1) the false designation must have a substantial economic effect on interstate commerce; and (2) the false designation must create a likelihood of confusion." *Johnson*, 149 F.3d at 502 (citing *Lyon v. Quality Courts United, Inc.*, 249 F.2d 790, 795 (6th Cir. 1957)). "Although the jurisdictional interstate commerce element is necessary, likelihood of confusion is the essence of an unfair competition claim." *Id.* (citations and internal quotation marks omitted). This circuit uses the same test for likelihood of confusion as it does for infringement. *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) (citing *Two Pesos v. Taco Cabana*, 505 U.S. 763, 780 (1992)).

As discussed, Liberty's and Freedom's marks are similar, and confusion is likely. Additionally, Defendants' infringement of the Marks substantially affects interstate commerce because the parties advertise online. *See Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 803 (6th Cir. 2015). For these reasons, Liberty's false designation and misrepresentation claim is likely to succeed on the merits.

### 3. Dilution

The Lanham Act entitles the "owner of a famous mark that is distinctive" to an injunction against someone who "commences use of a mark . . . in commerce that is likely to cause dilution . . . of the famous mark . . . any time after the owner's mark has become famous." 15 U.S.C. § 1125(c)(1). "Dilution law, unlike traditional trademark infringement law . . . is not based on a likelihood of confusion standard, but only exists to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark." *Audi AG*, 469 F.3d at 547 (quoting *AutoZone, Inc.*, 373 F.3d at 801; *Toucan Golf, Inc.*, 337 F.3d 616, 628 (6th Cir. 2003)).

Courts "use a five-point test to determine whether a plaintiff will succeed in a federal dilution claim. [The plaintiff] must show that its trademark is (1) famous and (2) distinctive, and that [the defendant's] use of the mark (3) was in commerce, (4) began after [the plaintiff's] mark became famous, and (5) caused dilution of the distinctive quality of [the plaintiff's] mark." *Id.* (citation and internal quotation marks omitted).

A mark is famous if it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2). To determine whether a mark possesses the requisite degree of recognition, courts may consider all relevant factors, including (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark is registered on the principal register. *Id.* But, as a threshold matter, "[f]ame for likelihood of confusion and fame for dilution are distinct concepts, and dilution fame requires a more stringent showing." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012). Indeed, courts have held that a mark is famous only if it "has become a household name." *Id.* (citations omitted).

Liberty does not establish that it has the requisite degree of recognition among the consuming public to be famous under the Lanham Act. While Liberty asserts that it "advertises and promotes the Marks throughout the United States and has invested substantial time and money to maintain and improve its franchise system," [DE 33 at ¶ 22], it presents no evidence that its Marks have become a household name. *See, e.g.*, *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 99 (2d Cir. 2001) (noting that "[t]he examples of eligible 'famous marks' given in the House Report" addressing dilution included "marks that for the major part of the century have

been household words throughout the United States," such as Dupont, Buick, and KODAK) (citing H.R.Rep. No. 104–374, at 3 (1995), *reprinted in* 1995 U.S.C.C.A.N. 1029, 1030)); *see also House of Bryant Publ'ns, LLC v. City of Lake City, Tenn.*, 30 F. Supp. 3d 711, 715 (E.D. Tenn. 2014) ("To achieve fame, the mark must be so ubiquitous and well-known to stand toe-to-toe with Buick or KODAK." (citation and internal quotation marks omitted)); *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 703 F. Supp. 2d 671, 699 (W.D. Ky. 2010), *aff'd*, 679 F.3d 410 (6th Cir. 2012) (finding that Marker's Mark's red wax seal was not famous). Thus, Liberty is not likely to succeed on the merits of its dilution claim.

### 4. Defend Trade Secrets Act

The Defend Trade Secrets Act ("DTSA") provides a private cause of action for owners of misappropriated trade secrets "if the trade secret[s] [are] related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DTSA became effective on May 11, 2016 and is not retroactive. *See* 18 U.S.C. § 1833; *C-Ville Fabricating, Inc. v. Tarter*, No. 5:18-CV-379-KKC, 2019 WL 1368621, at *12 (E.D. Ky. Mar. 26, 2019). The DTSA defines a trade secret as information for which (1) the owner has taken reasonable measures to keep secret, and (2) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. 18 U.S.C. § 1839(3).

"To prove misappropriation of a trade secret, a plaintiff must assert facts 'establishing an unconsented disclosure or use of a trade secret by one who used improper means to acquire the secret; or, at the time of the disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret.'" *C-Ville Fabricating, Inc.*, 2019 WL 1368621, at *12 (quoting *Ford*

*Motor Co. v. Launch Tech Co.*, No. 17-12906, 2018 WL 1089276, at *16 (E.D. Mich. Feb. 26, 2018)); *see also* 18 U.S.C. §1839(5). "[T]he term 'improper means' . . . includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]" 18 U.S.C. § 1839(6)(A).

The parties do not dispute that the information at issue—among other things, the training that Liberty provides to its franchisees in franchise operations; information on marketing, advertising, sales, and business systems; confidential operating, marketing, and advertising materials that are unavailable to the public; and customer lists—qualifies as trade secrets and are intended for use in interstate commerce. But the parties dispute whether actions taken by Selimovic and Freedom constitute misappropriation.

Liberty disclosed the trade secrets to Warren and The Franchise Corp. under the signed Franchise Agreements. As discussed, Selimovic was not herself a signatory to the Franchise Agreements. [*See* DE 33-1 at 825]. Selimovic was, however, an officer of The Franchise Corp., which was a signatory to at least one of the Franchise Agreements. [DE 26, Tr. PI Hearing at 562:1–4; DE 33-1 at 825]. Selimovic asserts that she was not "involved in any way" with the Franchise Agreements. [*Id.* at 563:9–25]. And although Selimovic asserts that Warren was not involved with Freedom, she admits that Freedom's website is registered under Warren's name. Selimovic claims that she used Warren's GoDaddy account to purchase the domain name because he already had a GoDaddy account and she did not. [*Id.* at 555:15–21].

But regardless of whether Selimovic was a signatory to the Franchise Agreements, Selimovic had a duty as an officer of The Franchise Corp. to maintain the secrecy of Liberty's trade secrets. Selomovic had access to Liberty's confidential information that Liberty had taken significant steps to keep confidential, including by disclosing that information only after executing

agreements protecting the information. [*See* DE 33-1 at 817–18]. Liberty asserts that Selimovic has misappropriated those trade secrets by, among other things, "commandeer[ing] the Franchise Locations," operating a competing business, and diverting customers. [DE 13-1 at 111]. Liberty also asserts that Selimovic "used the business knowhow, customer lists, and customer contact information that Warren and The Franchise Corp. obtained while operating the former Franchised Business to obtain business for themselves and/or Freedom Tax after the expiration of Warren and The Franchise Corp.'s Franchise Agreements." [DE 33 at ¶ 85]. Indeed, nothing in the record suggests that Selimovic had any experience in the tax-preparation business before becoming an officer of The Franchise Corp. and later operating Freedom, and many of the trade secrets at issue relate to tax-preparation training and operating materials. [DE 33 at ¶ 27]. Given that Freedom operates out of the Franchise Locations, uses marks that are confusingly similar to Liberty's, and has taken at least some portion of Liberty's customers who are unaware that Freedom is not part of the Liberty brand, Liberty has shown that misappropriation is likely. Thus, Liberty has shown that its DTSA claim is likely to succeed on the merits.

### 5. Unfair Competition

Under the Lanham Act, courts consider the same factors for a section 1125(a) (unfair competition) claim as they do for a section 1114 (trademark infringement) claim. *See Wynn Oil Co.*, 943 F.2d at 604; *Frisch's Restaurant, Inc.*, 759 F.2d at 1264; *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 213 (2d Cir. 1985). The Court has already found that Liberty is likely to succeed on the merits of its infringement claim. Liberty therefore is also likely to succeed on the merits of its unfair competition claim.

**B.     Irreparable Harm**

A party must generally show that, absent injunctive relief, it would suffer irreparable harm. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 505 (1959). Indeed, "[a] district court abuses its discretion when it grants a preliminary injunction without making specific findings of irreparable injury to the party seeking the injunction, and such an injunction must be vacated on appeal." *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 n.9 (8th Cir. 1981) (en banc)); *see also Gas Nat. Inc. v. Osborne*, 624 F. App'x 944, 948 (6th Cir. 2015). A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

**1.     Lanham Act**

In an action brought under the Lanham Act, "a finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears." *Wynn Oil Co.*, 943 F.2d at 608 (citation and internal quotation marks omitted). Thus, "[i]f the movant is likely to succeed on an infringement claim, irreparable injury is ordinarily presumed, and the public interest will usually favor injunctive relief." *PGP, LLC v. TPII, LLC*, 734 F. App'x 330, 332 (6th Cir. 2018) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 532–33 (6th Cir. 2004); *Wynn Oil Co.*, 943 F.2d at 608).

That said, when a plaintiff delays in applying for injunctive relief, any presumption that infringement alone will cause irreparable harm is neutralized, and "such delay alone may justify denial of a preliminary injunction for trademark infringement." *Blockbuster Entm't Grp., Div. of Viacom, Inc. v. Laylco, Inc.*, 869 F. Supp. 505, 516 (E.D. Mich. 1994) (citing *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275–76 (2d Cir. 1985)); *see also Wreal, LLC v. Amazon.com, Inc.*, 840

F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm.").  While delay in seeking relief may prevent a plaintiff from recovering damages, "it does not bar injunctive relief."  *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568 (6th Cir. 2000) (citing *TWM Mfg. Co. v. Dura Corp.*, 592 F.2d 346, 349–50 (6th Cir. 1979)).  A plaintiff must offer a "good explanation" for the delay, otherwise "a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief."  *Young v. Lumenis, Inc.*, 301 F. Supp. 2d 765, 772 (S.D. Ohio 2004) (citing *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995)).

Liberty first became aware that Selimovic had purchased substantially all of The Franchise Corp.'s assets, including its leaseholds, sometime before March 12, 2018—about eleven months before it filed this suit.  [DE 26, Tr. PI Hearing at 529:8–11; DE 31 at 721].  When Liberty learned of Selimovic's purchase, Liberty possessed images depicting Freedom's signage—which included the name "Freedom Tax" and the logo featuring Lady Liberty—at The Franchise Corp.'s previous locations.  [DE 26, Tr. PI Hearing at 538:13–17].[8]  Liberty did not dispute the use of the Marks at that time.

While this delay seems to undercut the sense of urgency that ordinarily accompanies a motion for preliminary relief, Liberty has justified the delay.  First, Liberty explained that "tax season [was] about over."  [*Id.* at 538:23–25].  Given the seasonal nature of the tax-preparation business, it was reasonable for Liberty to wait until the next tax season to see if Freedom would continue to operate under the Marks.  *See Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 366 (6th Cir. 1985) ("A reasonable businessman should be afforded some latitude to assess both the

_____

[8] The photographs were submitted to Liberty as part of Warren's affidavit in the Eastern District of Virginia case.  [DE 22-2].

impact of another's use of an allegedly infringing trademark as well as the wisdom of pursuing litigation on the issue."); *see also What-A-Burger of Virginia, Inc. v. Whataburger, Inc. of Corpus Christi*, 357 F.3d 441, 451 (4th Cir. 2004) ("[A] trademark owner has no obligation to sue, *i.e.*, his right to protection has not ripened, until the likelihood of confusion looms large." (citations and internal quotation marks omitted)).

Further, Liberty did not become aware that Selimovic was an officer of The Franchise Corp. until after Liberty first saw the infringing marks sometime before March 12, 2018. [DE 26, Tr. PI Hearing at 538:17–22]. While Selimovic's involvement with The Franchise Corp. is largely a separate issue from the Lanham Act claims, Liberty already had the Injunction in place against Warren and The Franchise Corp. in the Eastern District of Virginia when it filed suit in this Court. [DE 1-3 at 50]. It was reasonable for Liberty to presume that the Injunction, entered on July 2, 2018, covered The Franchise Corp.'s officers. [*See id.* at 51 (enjoining the defendants from using or displaying the marks without Liberty's consent)]. Once Liberty discovered that Selimovic was not only using the Marks but was an officer of The Franchise Corp., Liberty grew concerned that Selimovic would have access to the relevant proprietary information, increasing the economic need for litigation. *See Tandy Corp.*, 769 F.2d at 366.

For these reasons, Liberty's brief delay in filing suit does not outweigh the presumption of irreparable injury for the Lanham Act claims. *See Wynn Oil Co.*, 943 F.2d at 608. Liberty has thus shown a risk of irreparable harm on its Lanham Act claims.

### 2. Defend Trade Secrets Act

The DTSA "merely authorize[s] and do[es] not mandate injunctive relief and thus do[es] not allow a presumption of irreparable harm." *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1143 (10th Cir. 2017); *see also* 18 U.S.C. § 1836(b)(3)(A), (B) (stating that "a

court *may* . . . grant an injunction . . . to prevent any actual or threatened misappropriation," or the court may award "damages for actual loss caused by the misappropriation of the trade secret." (emphasis added)). Thus, when considering irreparable harm under the DTSA, courts generally analyze injunctive requests according to traditional notions of what is required for such relief. *See, e.g.*, *Freedom Med. Inc.*, 343 F. Supp. 3d at 523; *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *34 (S.D.N.Y. Oct. 25, 2018); *Earthbound Corp. v. MiTek USA, Inc.*, No. C16-1150 RSM, 2016 WL 4418013, at *10 (W.D. Wash. Aug. 19, 2016).

Liberty asserts that it will be irreparably harmed without an injunction because "[a]llowing Defendants to operate a competing business in violation of non-compete obligations and the Injunction, by which Selimovic is constrained as an officer of The Franchise Corp., severely cripples Liberty's ability to place a new franchisee in the former Franchise Locations and purloins the goodwill customers have with the Liberty franchise system." [DE 13-1 at 104]. Liberty also argues that "[a]bsent injunctive relief, Defendants will divert customers from former Liberty-franchised locations to their competing Freedom Tax business, which harms Liberty's goodwill." [*Id.*]. Defendants respond by arguing that "no former franchisee is . . . violat[ing] the terms of a non-compete provision, and Defendants are not engaging in conduct to mislead the public into believing Liberty and [Freedom] are affiliated." [DE 22 at 282].

As discussed, although Selimovic was not personally a signatory to the Franchise Agreements, her position as an officer with The Franchise Corp., which was a signatory, provided her with access to Liberty's confidential business information. Selimovic and Freedom have already benefited from this information. They have operated out of the Franchise Locations even after Liberty sought to exercise its right of first refusal for the leaseholds, used marks that are confusingly similar to Liberty's protected Marks causing actual confusion, and have taken at least

some portion of Liberty's customers who are unaware that Freedom is not part of the Liberty brand. This is likely to cause irreparable harm to Liberty's goodwill in the marketplace and overall business operations. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." (citation omitted)); *WHIC LLC v. NextGen Labs., Inc.*, 341 F. Supp. 3d 1147, 1165 (D. Haw. 2018); *Glycobiosciences, Inc. v. Woodfield Pharm., LLC*, No. 4:15-CV-02109, 2016 WL 1702674, at *8 (S.D. Tex. Apr. 27, 2016) ("The damages occasioned by a case involving breach of confidentiality and misappropriation of trade secrets is, by its nature, irreparable and not susceptible of adequate measurement for remedy at law."); *KFC Corp. v. Goldey*, 714 F. Supp. 264, 267 (W.D. Ky. 1989). For these reasons, Liberty has shown irreparable harm for its DTSA claim.

## C.      Substantial Harm to Others

Next, the Court must consider whether injunctive relief would harm others. *Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 542. This factor is generally concerned with harm to third parties, but courts also often consider the "balance of hardships" between the parties if an injunction were to issue. *See, e.g.*, *id.* at 550–51; *Nesco Res. LLC v. Walker*, No. 3:18-CV-00171-GNS, 2018 WL 2773321, at *5 (W.D. Ky. Apr. 23, 2018).

Here, no party argues that third parties will be harmed by an injunction. The only third parties that might be harmed are Freedom's customers, who would still be able to obtain tax-preparation services from other companies. *See Certified Restoration Dry Cleaning Network, L.L.C.*, 511 F.3d at 550–51. Liberty argues that the balance of hardships weighs in its favor because "[a]ny harm to Defendants is entirely self-inflicted." [DE 13-1 at 113]. Meanwhile,

Defendants argue that the balance weighs in their favor because "courts are unwilling to find in favor of a plaintiff when doing so will restrain engagement in commerce."  [DE 31 at 755–56].

Liberty is correct that Defendants' likely infringement of the Marks is arguably "entirely self-inflicted."  *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990), *holding modified on other grounds by Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) (collecting cases).  But the same cannot be said for the DTSA claim.  Were the Court to issue an injunction effectively enforcing the Franchise Agreements' broad non-competition clause against Selimovic, who was not a signatory to the Franchise Agreements, it would unjustifiably harm Selimovic's ability to earn a living in the Louisville area.  *See Chase Manhattan Bank v. Dime Sav. Bank of New York*, 961 F. Supp. 275, 277 (M.D. Fla. 1997) ("Without a sufficient showing that the alleged actions by the defendants are substantially likely to constitute one of the [claims] listed in the complaint, the Court concludes that the potential harm to the defendants outweighs the threatened injury, if any, to the plaintiffs. . . .").  Accordingly, this factor supports an injunction on the Lanham Act claims, but not on the DTSA claim.

**D.      Public Interest**

Finally, Liberty must show that the public interest favors a preliminary injunction.  It is generally in the public interest to grant an injunction in cases of infringement.  *See PGP, LLC v. TPII, LLC*, 734 F. App'x 330, 332 (6th Cir. 2018) (citations omitted); *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 n.7 (7th Cir. 1988); *Gougeon Bros., Inc. v. Hendricks*, 708 F. Supp. 811, 818 (E.D. Mich. 1988) ("Trademark infringement, by its very nature, adversely affects the public interest in the 'free flow' of truthful commercial information.").

Here, the Court has already found that Liberty is likely to succeed on the merits of its infringement claim.  This fact alone suggests that a preliminary injunction is in the public interest,

and Defendants present no arguments to rebut that presumption.  *See PGP, LLC*, 734 F. App'x at 332.  A preliminary injunction on the Lanham Act claims is thus in the public interest.

On the DTSA claim, Liberty presents no argument that the specific relief sought—enforcement of the Franchise Agreements' noncompete clauses against Selimovic—is in the public interest.  Even so, courts generally recognize that the public interest is served by enforcing agreements that conform to the legitimate expectations of business people.  *See   Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016); *Rita's Water Ice Franchise Corp. v. DBI Inv. Corp.*, No. CIV. A. 96-306, 1996 WL 165518, at *1 (E.D. Pa. Apr. 8, 1996).  While Selimovic was not personally a signatory to the Franchise Agreements, she was nonetheless an officer of The Franchise Corp., which was a signatory, and thereby under a duty not to improperly use, disclose, or otherwise misappropriate Liberty's trade secrets.  As an officer of a signatory to the Franchise Agreements, it was a legitimate expectation that Selimovic would protect Liberty's confidential information.  Thus, Liberty has shown that a limited preliminary injunction on the DTSA claim is in the public interest.

## E.     Balancing of Factors

As discussed, Liberty's infringement, false designation, and unfair competition claims are likely to succeed on the merits, while its dilution claim is unlikely to succeed on the merits.  Liberty shows that the substantial-harm-to-others and public-interest factors on those claims favor an injunction and that it will suffer irreparable harm on those claims without an injunction.  Liberty has thus justified a preliminary injunction on its Lanham Act claims.[9]

---

[9] Although the irreparable-harm factor is a closer call than the other preliminary injunction factors, an injunction would be proper even if Liberty were unable to show irreparable harm given the strength of its claims on the merits.  *See Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003) (noting that the preliminary injunction factors are "factors to be balanced, not prerequisites that must be met").

Meanwhile, Liberty's DTSA claim is likely to succeed on the merits and is in the public interest, and Liberty has shown that it will suffer irreparable harm without an injunction. But Liberty has not shown that an injunction would prevent substantial harm to others. Balancing these factors for the DTSA claim, Liberty has shown that a preliminary injunction is proper, although one more limited in scope than what it seeks in its motion.

Liberty asks the Court to "[e]njoin[] Defendants from operating a tax preparation business or using and/or displaying Liberty's Marks without Liberty's consent"; "[e]njoin[] Defendants from owning, maintaining, engaging in, or having any interest in any other business which sells any products similar to those sold as part of the Liberty"; "[e]njoin[] Defendants from employing or seeking to employ any person who is employed by Liberty or any other Liberty franchisee, or otherwise induce or seek to induce such person to leave his or her employment"; "[e]njoin[] Defendants from using any confidential information from manuals or systems provided by Liberty"; and "[e]njoin[] Defendants from diverting or attempting to divert any customer or business from Liberty or solicit or endeavor to obtain the business of any person who shall have been a customer of any of the Franchise Locations." [DE 13 at 90–91]. The DTSA provides for certain remedies, including an injunction to prevent actual or threatened misappropriation, provided that the injunction does not "prevent a person from entering into an employment relationship" and that any conditions placed on employment are based on "evidence of threatened misappropriation and not merely on the information the person knows." 18 U.S.C. § 1836(b)(3)(A)(i). Liberty has not suggested that Defendants have threatened to misappropriate a trade secret or argued that a narrower injunction would prevent further misappropriation. Thus, Liberty has not justified injunctive relief that limits the employment of Selimovic or others.

Given that Liberty has shown a likelihood of success on the merits of its DTSA claim and shown that it will suffer irreparable harm absent an injunction, however, an order preventing Selimovic from using trade secrets learned from her position at The Franchise Corp., or using trade secrets that she knows or has reason to know were acquired by a third party because of a relationship with Liberty involving a duty to maintain secrecy, would be consistent with the DTSA's enumerated remedies and adequately protect Liberty's interests pending an outcome on the merits.

## CONCLUSION

For the reasons above, and being otherwise sufficiently advised, **THE COURT HEREBY ORDERS AS FOLLOWS**:

(1) Liberty's Motion for Preliminary Injunction [DE 13] is **GRANTED IN PART** and **DENIED IN PART**.

(2) Defendants are hereby **ENJOINED** from:

    (a) Using or displaying the Marks without Liberty's consent; and

    (b) Using the Marks or any confusingly similar name, device, mark, service mark, trademark, trade name, slogan or symbol used in connection with any Liberty Tax Service® or SiempreTax+® franchise, including any reproduction, counterfeit copy, variation, emulation, or colorable imitation thereof which is likely to cause confusion or mistake or deceive the public.

(3) Defendants are further hereby **ENJOINED** from:

    (a) Using any trade secrets discovered by virtue of Selimovic's position as an officer at The Franchise Corp. or has reason to know that the trade secrets were

acquired by a third party by virtue of a relationship with Liberty involving a duty to maintain secrecy;

(b) Using any confidential information from manuals or systems provided by Liberty including, but not limited to, Liberty's operations manual; and

(c) Diverting or attempting to divert any customer or business from Liberty or solicit or endeavor to obtain the business of any customer or prospective customer of any of the Franchise Location.

(4) Liberty's Motion is **DENIED** insofar as it seeks to prevent Defendants from operating a tax-preparation business, employing or seeking to employ any person who is employed by Liberty or any other Liberty franchisee, or otherwise induce or seek to induce such person to leave his or her employment.

(5) This Order shall remain in force and effect until a final judgment is entered in this matter.

(6) "Despite the mandatory language of Fed. R. Civ. P. 65(c), 'the rule in [this] circuit has long been that the district court possesses discretion over whether to require the posting of security.'" *Appalachian Regional Healthcare*, *Inc. v. Coventry Health and Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (quoting *Moltan Co. v. Eagle-Picher Indus.*, *Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)). Neither party in this case seeks the posting of a security, and the Court exercises its discretion to determine that the posting of a security is not required.

Rebecca Grady Jennings, District Judge
United States District Court

May 9, 2019

Cc:     Counsel of record